United States District Court
Southern District of Texas
FILED

APR 2 0 2004

Michael N. Milby
Clerk of Court

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

LUIS ANTONIO HERNANDEZ
    Petitioner

**v.**

UNITED STATES OF AMERICA
    Respondent

Civ. No.: **B-04-073**
USDC No. : 1:03CR00172-001

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE, SET-ASIDE,**
**OR CORRECT A SENTENCE FOR A PERSON IN FEDERAL CUSTODY**
**PURSUANT TO 28 U.S.C. § 2255**

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

    **COMES NOW INTO COURT** the Petitioner **Luis Antonio Hernandez**, acting in propia persona, and respectfully files his motion and memorandum of law in support pursuant to Title 28, United States Code, Section 2255.

### JURISDICTION

    This Honorable Court has jurisdiction in this case pursuant to Title 28, United States Code, Section 2255, thereby giving this Honorable Court the authority to entertain this motion.

### STATEMENT OF THE CASE

    On March 11, 2003, a Federal Grand Jury in Brownsville, Texas, returned a two-count indictment charging Luis Antonio Hernandez and others with (1) Conspiracy to possess with intent to distribute a quantity, more than one hundred (100) kilograms, that is, approximately 720 kilograms (1583.6 pounds) of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 846. (2) possession with intent to distribute a quantity, more than one kilogram, that is, approximately 625 kilograms

(1375 pounds) of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2.

On May 1, 2003, the government's oral motion to amend the indictment was granted. Accordingly, the indictment was modified to read "625 kilograms (1375 pounds)."

On May 1, 2003, Luis Antonio Hernandez appeared before United States District Judge Hilda G. Tagle and entered a plea of guilty to Count two of the indictment.

## STATEMENT OF THE FACTS

On December 10, 2002, Drug Enforcement Administration ("DEA") Agents received information from a confidential informant ("CI") that Jesse (LNU), later identified as Luis Antonio Hernandez ("Hernandez") was recruting and individual to transport an undetermined amount of marijuana and cocaine from the Rio Grande Valley to an undisclosed location in Tampa, Florida. Based on this information, the CI contacted Hernandez and agreed to meet him in McAllen, Texas, to discuss the transaction. The pair met at an Exxon gasoline station whereby they discussed the transportation of approximately 2,000 pounds of marijuana from the Rio Grande Valley area to the East Coast. The CI was hired for the task and was advised he would be contacted at a later date with more information.

On February 24, 2003, Hernandez and the CI met in met Harlingen, Texas. During said meeting, Hernandez told the CI he wanted him to transport approximately 1,000 pounds of marihuana to North Carolina. He also advised the CI that he wanted him to meet with "los buenos," or referring to the main dealers. The CI informed Hernandez contacted someone via cellular telephone. Hernandez handed the telephone to the CI and he was advised by a male voice that the deal would be terminated if he refused to meet. Each individual

left the area in their respective vehicle and traveled to "Las Cazuelas"
restaurant located in Harlingen, Texas.

At the restaurant, surveillance units observed as Hernandez and three (3)
Hispanic males met with the CI. One (1) of the individuals identified himself
as Mike Garcia-Jasso. The second individual was identified as Chuy (LNU) and
the third individual remained unidentified. All three(3) co-conspirators remain
unindicted. During the meeting, Garcia-Jasso negotiated the transportation
of 1,000 pounds of marihuana. He agreed to pay the CI $90.00 per pound of
marihuana he transported to Chicago. Garcia-Jasso told the CI he would be
paid $4,000 to $5,000 in advance and the balance once the delivery was completed.
The CI was told he would be paid eight (8) days thereafter to prevent him
from double crossing the group. Chuy(LNU) commented if the CI double-crossed
them, there would be consequences. Subsequently, the unidentified Hispanic male
requested the CI place the license plate number of the tractor-trailer to be
used in the commission of the offense in a sealed envelope. He elaborated
if the CI was apprehended the would hire an attorney to determine what transpired.
The CI was advised the envelpe would be returned to him in its original condition
if no such event occurred. Following the discussion, Hernandez and the CI left
in their respective vehicles. Garcia-Jasso, Chuy (LNU), and the unidentified
Hispanic male left in a white Toyota Land Cruiser.

On February 27, 2003, Hernandez met with the CI and an undercover agent
(UC) at the Taqueria Jalisco restaurant located in Harlingen, Texas. Shortly
thereafter, Chuy (LNU) arrived with an unidentified Hispanic male. Chuy (LNU)
sat next to Hernandez and the second individual sat at the table next to the
group. During this meeting, Chuy (LNU) made arrangements with the CI in regards
to a shipment of approximately 1,000 to 2,000 pounds of marihuana. Chuy (LNU)
advised the CI the shipment would be delivered to two (2) separate locations,

3

Georgia and North Carolina.  It was agreed the marihuana would be smuggled
in cabbage boxes which would provided by the CI.  The CI elaborated the
marihuana would be concealed within a cabbage shipment and a fraudlent bill
of lading would be prepared.  Chuy (LNU) advised the CI the boxes would be marked
with a letter to identify which boxes were going to be delivered at each location.
Arrangments were made to have the delivered at each location.  Arrangements were
made to have the cabbage boxes delivered to Hernandez at a later time.

On February 28, 2003, Hernandez met with the CI and UC at the San Juan Del
Valle Shrine located in San Juan, Texas, to pick up one hundred (100) cabbage
boxes which would be utilized to transport the aforementioned marihuana.  During
this meeting, surveillance units observed all three (3) individuals removing
collapsible cabbage boxes from the UC vehicle and loading them into Hernandez'
vehicle.  Once complete, Hernandez was followed to McAllen, Texas, whereby
he was observed meeting with two (2) unidentified Hispanic males.  Hernandez
removed the boxes from his vehicle and loaded them into a black Jeep Cherokee.
Surveillance of the Jeep Cherokee was initiated and agents observed the driver
meeting with two (2) other unidentified individuals at another location.
Surveillance was terminated after the agents lost sight of the vehicle.

On March 1, 2003, Hernandez met with the CI and UC at the Alamo Bank
parking lot located in Harlingen, Texas.  Upon arrival, Hernandez requested
an envelope from the CI which contained the description and license plate of
the tractor-trailer to be used in the commission of the offense.  Subsequently,
Hernandez conducted an exterior inspection of the tractor-trailer.  While he
conducted the inspection, he was observed conversing with someone on his cellular
telephone.  Hernandez informed the CI the Chuy (LNU) had requested that he take

4

several photographs of the tractor-trailer.  He proceeded to a Conoco gasoline station located across the street and returned with a disposable camera.  He took several photographs of the vehicle and advised it would not be long for the load to be ready.  The CI advised Mr. Hernandez to contact him once he was en route with the marihuana so directions to the loading site could be provided to him.  Hernandez left the area and was followed to 6516 Bandera Street in Edinburg, Texas.  Along the way, agents obsevered a black Jeep Cherokee traveling in front of Hernandez' vehicle vehicle which also stopped at the aforementioned residence.  Surveillance was established and units observed six (6) vehicles at the residence..  A license plate query revealed the Safari van was registered to Doris Boracio, later identified as García-Jasso' girlfriend.

Surveillance units observed as the Safari van and Hernandez' vehicle were parked in reverse within the garage.  The vehicle were then driven out of the garage and parked on the street.  Shortly thereafter, the agents lost sight of the vehicles.  Information provided to the units revealed the CI had received the CI had received a call from Hernandez advising him the marihuana was en route to Harlingen, Texas, in two (2) seperate vehicles.  Surveillance of the home continued.

At approximately 8:14 p.m. Hernandez met with the CI and UC in Harlingen, Texas.  Mr. Hernandez was traveling in his vehicle and was accompanied by a red GMC Safari van.  He parked his vehicle next to the UC tractor-trailer while the Safari van was reversed toward the rear doors of the tractor-trailer.  A Hispanic male, later identified as Jesus Tapia, exited the passenger side of the van and climbed inside the tractor-trailer.  Another Hispanic male, later identified as Jose Manuel Guerrero, was observed handing Mr. Tapia and the UC boxes from within the van.

During the same time, Hernandez exited his vehicle and walked to the rear

5

of the tractor-trailer. Agents observed as he conversed with the CI and then with someone on his cellular telephone. I t appeared he was providing someone with directions to the location. Once Hernandez terminated his call, the arrest signal was given. Meanwhile, Tapia jumped down from the tractor-trailer and Guerrero closed the rear doors to the Safari van. Agents observed Guerrero drive the Safari van to the south side of the parking lot and Hernandez reversing his vehicle to the rear of the tractor-trailer. Tapia climbed back into the tractor-trailer but jumped off once he saw the police cruisers. He ran toward a chain linked fence and attempted to jump over it. His trouser's were caught in the barbed wire causing his apprehension. Hernandez and Guerrero were arrested without incident. Agents seized approximately thirty-one (31) boxes containing one hundred twenty-two (122) bundles of marihuana weighing approximately 567.18 kilograms. A subsequent analysis revealed the 567.18 kilograms included 37.70 kilograms of wrapping; therefore, the net weight of the marihuana seized was approximately 529.48 kilograms.

Agents conducting surveillance at the Bandera residence advised of the arrest and they initiated a Consent to Search contact. Contact was made with Maria Ermelinda Vasquez who was indentified as Garcia-Jasso spouse. She advised the home belonged to the couple and was paid in full. Ms. Vasquez elaborated two (2) weeks prior to March 1, 2003, her husband had allowed Jesus Tapia to reside in the front bedroom. She stated Tapia was not required to pay rent for the space.

Each room of the residence was assigned a number so as to facilitate the search and inventory. A search of the front bedroom or Tapia's rental uncovered (10) bundles of marihuana hidden within the closet which weighed approximately 57.82 kilograms. Agents uncovered plastic bags containing marihuana cigarettes and marihuana weighing approximately .19 kilograms in the top drawer of the

6

night stand and .16 kilograms in a dresser drawer.  A Voicestream cellular telephone and charger were also found in the same location as the marihuana. A shoe box containing several store receipts and papers with Tapia's name imprinted on them was also seized.  A subsequent analysis revealed the net weight of the marihuana seized at the site was approximately 54.87 kilograms.

Within the master bedroom, agents found a Food Saver vacuum sealer and three (3) photographs.  A bag containing plastic containers for the vacuum sealer and an electric knife were found in the closet.  A Winchester 1300 Defender shotgun was mounted behind the closet door while a Universal .30 rifle was found in the closet.  A safe containing assorted tax and property documents was also uncovered.

A search of the garage uncovered a white Toyata Land Cruiser as seen at the February 24, 2003, negotiations.  Other items found in the garage included the following:  several rolls of clear tape, a trash bag containing rubber gloves covered in axle grease, plastic handles for shrink-wrap rolls, sixty-eight (68) collapsible cabbage boxes, a set of Pelouze scales and a purple marihuana bong.  There was no property of evidentiary value found in the rest of the household.

Post-arrest statements provided by Gurrero revealed he had traveled to 6516 Bandera Street in Edinburg, Texas, on March 1, 2003, where his friend traveled to the residence to attend a barbeque and help wrap marihuana.  When he arrived, he walked directly into the garage where Tapia and Hernandez were located. Guerrero acknowledged he helped wrap and package marihuana located on the scene with tape and placed them into cabbage boxes.  He elaborated there was no one else in the garage and said Hernadez was directing Tapia and himself as to wrap and box the marihuana.  Hernadez stated he did not know if there was anyone else in the residence as he remained in the garge for approximately forty-five (45) minutes before Hernandez reversed a red van into the garage

for loading. After it was loaded, Tapia drove the van out of the garage. Guerrero stated he could not recall when or how the Dodge Ram was loaded. Subsequently, he entered the van on the passenger side and they followed Hernandez' vehicle through the back roads of Edinburg, Texas, to a Motel 6 located in Harlingen, Texas. Guerrero advised along the way he switched places with Tapia and drove to the warehouse where they were eventually apprehended. Once at the warehouse, he backed the van toward the rear of the tractor-trailer, opened the rear doors and handed the boxes to Tapia and another individual. After he unloaded the van, he moved the van to make room for Hernandez' vehicle. Hernandez reversed his vehicle toward the rear of the tractor-trailer but was not unloaded as they were arrested.

Post-arrest statements provided by Hernandez revealed he had been recruited by Chuy (LNU), and an unidentified Hispanic on February 24, 2003. Hernandez elaborated he took photographs of the tractor-trailer used in the commission of the offense as requested by Chuy (LNU) on March 1, 2003. Hernandez reportedly met with Chuy (LNU) in Alamo, Texas, after the meeting and provided him with the photographs. Upon further questioning, Hernandez stated he could not remember where he picked up his vehicle which had been loaded with marihuana.

8

reason for not doing so." See **United States v. Coke**, 404 F.2d 836, 846-47 (2d Cir. 1968) (en banc).

Consequently, a defendant generally bears the risk of attorneys' errors which result in a procedural default. Such errors <u>cannot</u> be attributed to the defendant when counsel's performance is constitutionally ineffective. **Strickland v. Washington**, 446 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); **Murray v. Carrier**, 477 U.S. at 488, 106 S.Ct. at 2645. But, where a trial, sentencing, or appellate counsel is constitutionally ineffective, and his or her deficient performance results in actual prejudice to the defendant, the exceptional circumstances for the § 2255 remedy is apparent. **Reed v. Ross**, 468 U.S. 1, 99, 104 S.Ct. 2901, 2906, 82 L.Ed.2d (1984).

Further, relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights, claims, or errors and will not bar habeas relief under § 2255, absent a deliberate choice not to appeal made by conscious election. **Kaufman v. United States**, 394 U.S. 217, 220, n.3, 89 S.Ct. 1068, 1070-71, n.3, 22 L.Ed.2d 227, 233-234 (1969); **Buckelew v. United States**, 575 F.2d 515, 519 (5th Cir. 1978).

10

ISSUE I.   INEFFECTIVE ASSISTANCE OF COUNSEL

The United States Supreme Court in **Gideon v. Wainwright**, 372 U.S. 335, 339, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), recognized that the source of the right of effective assistance of counsel was the specific Sixth Amendment guarantee of the right to assistance of counsel, made obligatory upon the states by the due process clause of the Fourteenth Amendment.  **Argersinger v. Hamlin**, 407 U.S. 25, 34, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972).

In **Strickland v. Washington**, 466 U.S. 668, 678, 104 S.Ct. 2052, 2064, 80 L. Ed.2d 674 (1984), the Supreme Court establish a two-part test to determine when the Constitution requires a criminal judgement be overturned because of ineffective assistance of counsel: (1) deficiency of trial counsel's performance; and (2) a showing that the deficient performance prejudiced the defense.

To meet the prejudice prong of the **Strickland** test, "[t]he defendent must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  **Strickland**, 466 U.S. at 694, 104 S.Ct. at 2064.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  **Id**.  The reviewing court "must consider the totality of the evidence before the judge or jury."  **Id**.  at 695, 104 S.Ct. at 2069.

The ineffective assistance of counsel must clearly establish both prejudice and deficient performance in order to be raised successfully.  It is not enough for a defense to be raised successfully.  It is not enough for a defense to be admittedly shoddy; that shoddiness must directly impact upon a defendant's final outcome.  **Lockhart v. Fretwell**, 506 U.S. 364, 369,113 S.Ct. 838 (1993); **Strickland v. Washington**, 466 U.S. 688, 687, 104 S.Ct. 2052 (1984).

The above has been and remains the accepted standard of review for determining whether defendant's counsel has fulfilled his constitutionally mandated mission,

11

or whether his inadequacies are beyond the pale of accepted behavior and cry for reversal.

The Sixth Amendment right to counsel means far more than the mere presence of a warm body. Counsel must play a role necessary to insure that the proceedings at hand are fair, especially at those stages of the legal process that have been termed "critical." A critical juncture is one which substantially affects the right of the defendant. **Mempa v. Ray**, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1969), and where the lack of effective representation could be deemed by reasonable jurists to be highly prejudicial. Recognized critical stages can include the entire gamut of the legal process from the day of arrest through sentencing and beyond, and need not be broad and interwoven but simply an isolated error if the particular error is sufficiently egregious and prejudicial. **Murray v. Carrier**, 477 U.S. 478, 496 (1986). It is a client's right to expect that his "lawyer will use every skill and expend every energy, and tap every legitimate resource in the exercise of independent professional judgement on behalf of his client and in undertaking representation on the client's behalf." **Frazier v. United States**, 18 F.3d 778, 785 (9th Cir. 1994); **Woodward v. Collins**, 989 F.2d 1027, 1028 (5th Cir. 1990).

That then counsel Alberto Villegas ("Villegas") did not discharge his duty in accordance with the requirements of the Sixth Amendment and in doing so was deficient in performance is oxymoronic en extremis. There was no "performance" by counsel Villegas in the instant offense, rether, should be termed "a performance," that is, an orchestrated attempt to obfuscate and conceal his own deficiencies; deficiencies concerning lines of inquiry never explored, and issues of great importance to his client swept aside.

A more retrospective adumbration of issues at sentencing in response to a Pre-Sentence Investigation Report ("PSI") is not a strategic and coherent defense. By the time of sentencing, foundational and substantive issues have

12

have already been decided.  Sentencing is, in fact, a time for meting out
punishment and for final clarifications that relate to it.  It is not a willy
nilly attempt to conceal gross negligence and inadequacies obvious to the most
modest of jurists by registering objections to a PSI solely for the purpose of
making a record to protect his own interests against his own failings at a
later date.

While it is the true purpose of an ineffective assistance of counsel
argument, especially when appled to a pro-se defendant in the light of liberal
construence to seek an in-depth review of the record for fundamental grossness,
unfairness and prejudice rather than to expound upon each individual inequity,
it is worthwhile here as indicator, to reframe briefly the more egregious
malfeasance of counselor Villegas.

## A.  Failure to file a direct appeal

Hernandez asserts that he apprised Mr. Villegas that he wanted him to
file a notice of appeal on his behalf.  Hernandez asserts that he convey
this information right after he was sentenced.  Furthermore, Hernandez
convey to Mr. Villegas that did not agree with the three-level enhancement
for aggravating role in the offense.

Under the United States Sentencing Guidelines ("USSG") § 3B1.1(b),
a defendant receives a three-level upward adjustment if he "played aggravating
role in the concerted activity as he played an extensive part in the planning
and organization of the offense.  Pursuant to USSG § 3B1.1(b), if the defendant
was a manager and the criminal activity involved five (5) or more participants
or was otherwise extensive."

13

Based on the aforementioned argument, it is clear that there was no performance, as guaranteed by the Sixth Amendment of the United States Constitution to effective assistance of counsel, by Mr. Villegas, Mr. Villegas's act of not filing the required notice of appeal, within ten days after sentencing, was prejudicial to Hernandez, for he attempted to file a late notice of appeal, pro-se, and was consequently denied as being untimely.

**B.  Failure to investigate**

The claim of counsel's failure to investigate is subjected to the same standards of **Strickland v. Washington**, 466 U.S. 668, 687–88 (1984). Counsel has a duty to make reasonable investigations or to make a reasonable decision to make particular investigations that are necessary. **Id.**, **Nelson v. Hargett**, 989 F.2d 847 (5th Cir. 1993. At the same time, bare allegations do not suffice. "A defendant who alleges a failure to investigate on part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." **United States v. Green**, 882 F.2.d 999, 1003 (5th Cir. 1989).

The Fifth Circuit has held that failure to investigate falls below the customary level of skill and knowledge required. **Profitt v. Waldron**, 81 F.2d 1245 (5th Cir. 1987). Failure to investigate is not a discretionary technical decision. **Beavers v. Balkcom**, 636 F.2.114 (5th Cir. 1981). Under the **Bouchillon v. Collins**, 907 F.2d 589 (5th Cir. 1990) standard,

14]

counsel who fails to investigate may be guilty of an appalling lack of professionalism.

An attorney's failure to investigate the case against the defendant and to interview witnesses can support a finding of ineffective assistance. See **Moore v. Johnson**, 194 F.3d 586, 608 & 616 (5th Cir. 1999); and **Bryant v. Scott**, 28 F.3d 1411, 1435 (5th Cir. 1994). The extent of an attorney's investigation into an area must be viewed in the context of the defendant's cooperation with the attorney's investigation and with a heavy measure of deference to counsel's judgments. See **Carter v. Johnson**, 131 F.3d 452, 463 (5th Cir. 1997), cert denied, 523 U.S. 1099 (1998); and **Randle v. Scott**, 43 F.3d 221, 225 (5th Cir. 1995), cert. denied, 515 U.S. 1108 (1995) (ruling that trial counsel was not ineffective for failing to investigate the validity of the defendant's prior conviction where the defendant was aware that the prior conviction had been reversed but failed to disclose same to his counsel and, instead, instructed his counsel to cease investigation into the matter as to expedite the defendant's entry of a guilty plea). However, an attorney who is aware of potential mitigating evidence is obligated to investigate the existence of such evidence beyond merely communicating with the defendant. **Ransom v. Johnson**, 126 F.3d 716, 723 (5th Cir. 1997), cert. denied, 522 U.S. 944 (1997).

Hernandez asserts that he requested to Mr. Villegas to review and investigate Confidential Informant's ("CI") file.

Hernandez repeatedly told Mr. Villegas to investigate and review the CI's agreement to cooperate with the government; any debriefing report(s) or an outline of what type of case(s) the CI might produce; the CI's personal and criminal history; the amount of money paid to the CI for information

15

and expenses, and any other privilege(s) the CI was entitled to for the information provided to the government.

Moreover, if Mr. Villegas would have investigated and reviewed the CI's file, he could have learned of any internal memoranda prepared by the controlling agent documenting any informant misconduct, if any. This information is crucial to a defendant to establish the credibility of the CI.

Mr. Villegas failed to investigate and review the sign-out/sign-in logs that record the date and time the CI's file was removed and returned. This information could have been valuable for Hernandez to learn in the CI was, at any time, suspected or alleged to have committed a violation of agency procedure or law. It was important to learn if agency internal affairs agents ever signed-out the file, or if someone signed-out the file to investigate any type of misconduct by the CI.

Mr. Villegas failed to interview Hernandez's co-defendants. If Mr. Villegas would have interviewed them, he would have found out that Hernandez was not a supervisor, as the government claimed he was. Hernandez was simply a worker and had no control, whatsoever, over the workers or the drugs.

Hernandez also requested Mr. Villegas to request, as part of his discovery, any and all telephone conversations between him and the CI. This information was crucial for Hernandez, for it would have revealed that the CI was the one who contacted Hernandez, not, like the government made it seem, Hernandez contacted him.

Mr. Villegas' acts and ommissions prejudiced Hernandez, for by investigating the CI and Hernandez's co-defendants, he would have learned

16

and expenses, and any other privilege(s) the CI was entitled to for the information provided to the government.

Moreover, if Mr. Villegas would have investigated and reviewed the CI's file, he could have learned of any internal memoranda prepared by the controlling agent documenting any informant misconduct, if any. This information is crucial to a defendant to establish the credibility of the CI.

Mr. Villegas failed to investigate and review the sign-out/sign-in logs that record the date and time the CI's file was removed and returned. This information could have been valuable for Hernandez to learn in the CI was, at any time, suspected or alleged to have committed a violation of agency procedure or law. It was important to learn if agency internal affairs agents ever signed-out the file, or if someone signed-out the file to investigate any type of misconduct by the CI.

Mr. Villegas failed to interview Hernandez's co-defendants. If Mr. Villegas would have interviewed them, he would have found out that Hernandez was not a supervisor, as the government claimed he was. Hernandez was simply a worker and had no control, whatsoever, over the workers or the drugs.

Hernandez also requested Mr. Villegas to request, as part of his discovery, any and all telephone conversations between him and the CI. This information was crucial for Hernandez, for it would have revealed that the CI was the one who contacted Hernandez, not, like the government made it seem, Hernandez contacted him.

Mr. Villegas' acts and ommissions prejudiced Hernandez, for by investigating the CI and Hernandez's co-defendants, he would have learned

16

that there were many inconsistancies with the information provided by the
CI to the government and also the court erred in enhancing Hernandez's role
as a supervisor of the offense.

Mr. Villegas did not act as the counsel guaranteed to a defendant by
the Sixth Amendment of the United States Constitution.

## C. Other ineffectiveness

Mr. Villegas apprised Hernandez that by pleading guilty he was going
to recieve a sentence of not more than five (5) years.  Moreover, he
told Hernandez that he was not going to receive any enhancement(s) for
aggravating role, and that he was going to receive a two-level reduction
on his sentence under the safety-valve provision of the USSG § 5C1.2.

Furthermore, Mr. Villegas never provided Hernandez with copies of
his discovery.  Hernandez repeatedly requested Mr. Villegas to provide
him with copies of the DEA reports, and other documents that were part of
his discovery.

By having copies of his discovery, Hernandez would have made a
better determination to either plead guilty or take his case to trial.

Before sentencing, Hernandez tried to contact Mr. Villegas, on various
occasions, via telephone, to inform him that he had a copy of the title of
a truck and a bill of sale to prove that the CI was the one who provided
him with those documents because he sold him a truck and that was the reason
why the CI contacted him and he would also call the CI.

Requisite prejudice regarding the above is plain.  At any point along
a given continuum, Hernandez could have received significantly less time
than the 78 months meted out to him.  His counsel's seeming lack of

preparation and professionalism cost his client with a three-level enhancement for aggravating role pursuant to § 3B1.1(b), a possible award of a two-level downward departure under the safety-valve provision, pursuant to USSG § 5C1.2, and his sentence would not have been subjected to a minimum mandatory of five years.

Mr. Villegas's inability to defend his client adequately and within the scope of the Sixth Amendment and well settled law is woven indelibly throughout the fabric of this proceeding. Mr. Villegas' actions bespeak gross ineffectiveness, ineffectiveness which in the most fundamental sense betrayed and prejudiced his client.

## ISSUE II.  HERNANDEZ IS ENTITLED TO AN EVIDENTIARY HEARING

Hernandez contends that because of the nature of his claim in the present motion, he should be granted an evidentiary hearing to further prove his claims. Section 2255 provides that a petitioner is entitled to an evidentiary hearing on his motion unless the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief.  Rule 4(b) of the rules governing Section 2255 proceedings in the United States District Court provides that a hearing need not be held if it plainly appears from the face of the motion that Hernandez is entitled to no relief.  "Thus, a petition can be dismissed without a hearing if the Petitioner's allegations, accepted as true, would not entitle the Pellitioner to relief, or if the allegations cannot be accepted as true because the are contradicted by the record, inherently incredible, or conclusion, rather than statements of fact."  **Dzivrot v. Luthor**, 897 F.2d 1222, 1225, (1st Cir. 1990).  However, the Fifth Circuit has indicated that the Petitioner need only show an "independent indicia of the likely merit of his contentions." **Harmason v. Smith**, 888 F.2d 1527, 1529 (5th Cir. 1988).

In the present case, if the Court take Hernandez's claims as true, as it must for the determination, it is apparent that Hernandez has stated claims for which relief would be granted.  Futher, Hernandez has shown, through statutes and caselaw, that there is merit to all of his contentions.

Therefore, to ensure that the fundamental tenants of due process are comported within this case, an evidentiary hearing should be held to determine the facts surrounding the issues raised by Hernandez.

## CONCLUSION

**WHEREFORE,** premises considered, Hernandez pray the Honorable Court to grant him an evidentiary hearing to resolve the issues set forth herein.   In the alternative, Hernandez request the Honorable Court to vacate and set—aside his conviction and/or sentence.

Respectfully submitted,

Date: 4-15-04

Luis A. Hernandez
82033—079    H/D
Federal Correctional Institution
P.O. Box 9000
Forrest City, AR 72336—9000

20

## CERTIFICATE OF SERVICE

I hereby certify that I mailed an original and two copies of the

motion and memorandum of law pursuant to 28 U.S.C. § 2255, via

Certified Mail, on this 15th Day of April , 2004,

addressed to:

CLERK, U.S. DISTRICT COURT
600 E. HARRISON ST., #101
BROWNSVILLE, TEXAS 78520

Luis Antonio Hernandez
82033-079  H-D
Federal Correctional Institution
P.O. Box 9000
Forrest City, AR 72336-9000

21