UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| LUIS ANTONIO HERNANDEZ,<br>  Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>  Respondent. | § § § § § § § § | Civil No. B-04-073 ✓<br>(Criminal No. B-03-172) |

### RESPONSE TO HERNANDEZ'S
### MOTION FOR RELIEF PURSUANT TO 28 U.S.C. § 2255
### AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

The United States of America ("the government"), by the United States Attorney for the Southern District of Texas, files this Response to Luis Antonio Hernandez (Hernandez)'s Motion for Relief Pursuant to 28 U.S.C. § 2255. In support thereof, the government would show the court the following:

I.

### JURISDICTION

On May 1, 2003, Hernandez entered a plea of guilty to the charge of possession with intent to distribute more than 100 kilograms of marijuana, a violation of 21 U.S.C.. § 841(a)(1) (Dkt 36). The district court accepted Hernandez's plea, found him guilty, and ordered the preparation of a pre-sentence investigation report (Dkt 38). The court imposed Hernandez's sentence on July 28, 2003: The district court remanded Hernandez into the custody of the Bureau of Prisons to serve a 78-month term of imprisonment that is to be followed by a five-year term of supervised release. At the close of the sentencing hearing, the district court advised Hernandez of his right to challenge his sentence on direct appeal (Dkt 56). The judgment of conviction and sentence was entered on August 13, 2003 (Dkt 61).

Four months later, on December 12, 2003, Hernandez filed a pro se notice of appeal (Dkt 83). The United States Court of Appeals for the Fifth Circuit docketed the case under Case No. 03-41723, and dismissed it on January 7, 2004 (Dkt 86). On April 20, 2004, Hernandez filed a motion to vacate, set aside, or correct sentence. Hernandez's motion is timely filed and this court is vested with jurisdiction under 28 U.S.C. § 2255.

## II

## **GROUNDS FOR RELIEF**

In his motion for relief under 28 U.S.C. § 2255, Hernandez advances the following grounds for relief under the general rubric of ineffective assistance of counsel. In particular, Hernandez complains that his Sixth Amendment right to the effective assistance of counsel was abrogated in the following respects:

A. Hernandez reportedly advised his attorney that he wanted to perfect an appeal from the sentence imposed by the district court, but counsel failed to file a notice of appeal thereby depriving him of his statutory right to appeal his sentence;

B. Hernandez further avers that his attorney failed to conduct an investigation into the file of the confidential informant, failed to interview his co-defendants, and failed to look into telephone records which would have revealed that Hernandez was merely a participant in this marijuana trafficking endeavor and not a supervisor;

C. Finally, Hernandez asserts that his attorney induced him to plead guilty with suggestions that he would receive as part of his sentence a term of imprisonment of not more than five years and he could probably secure a reduction and a sentence below the statutory minimum under the so-called safety valve provision, 18 U.S.C. § 3553(f) and USSG § 5C1.2.

2

## III

## **STATEMENT OF FACTS**

On December 10, 2002, Drug Enforcement Administration (DEA) agents learned that a fellow called "Chuy", later identified as Luis Antonio Hernandez, was looking for someone to transport marijuana and cocaine from the Rio Grande Valley to Tampa, Florida. This information was reported to the DEA agents by a confidential informant (CI) who was instructed to contact Hernandez and offer his services. The CI contacted Hernandez and arranged a meeting in McAllen, Texas. The meeting took place in an Exxon gasoline station. The subject of this meeting was the transportation of 2000 pounds of marijuana from the Rio Grande Valley to the east coast. The CI persuaded Hernandez that he could do the job and was hired (PSR ¶ 9).

On February 24, 2003, the CI and Hernandez met in Harlingen, Texas. At this meeting, Hernandez told the CI he wanted him to transport roughly 1000 pounds of marijuana to North Carolina. Hernandez also wanted the CI to meet his principals whom he called "los buenos". The CI told Hernandez that he had no desire to meet with anyone else. Hernandez placed a cellular telephone call and handed the phone to the CI. The party who had received Hernandez's call told him that if he persisted in his refusal to meet, there would be no agreement. A meeting was duly arranged at "Las Cazuelas", a restaurant in Harlingen, Texas (PSR ¶ 10).

At the restaurant, DEA surveillance agents watched as Hernandez and three Hispanic gentlemen met with the CI. One of these three individuals was affirmatively identified, he was Miguel Angel Garcia-Jasso. At this meeting, Garcia-Jasso negotiated the transportation of 1000 pounds of marijuana. Garcia-Jasso agreed to pay the CI $90.00 per pound of marijuana transported to Chicago. The CI would receive an advance payment of between $4000 and $5000; the balance

would be paid upon delivery. To insure that the CI did not skim any of the contraband for himself, the balance would be paid eight days after delivery. One of the unidentified Hispanic males, simply called "Chuy", told the CI that he would suffer adverse consequences in the event he double crossed them. If apprehended with the contraband, the CI was told that an attorney would be hired to represent him so that the owners could find out how their inventory came to be seized.(PSR ¶ 11).

On February 27, 2004, the CI, accompanied by an undercover agent, met with Hernandez at the Taqueria Jalisco, a restaurant in Harlingen, Texas. The CI, Hernandez, and the undercover agent were soon joined by "Chuy" and another unidentified Hispanic male. During this meeting, "Chuy" and the CI made arrangements to transport between 1,000 and 2,000 pounds of marijuana to locations in Georgia and North Carolina. It was agreed that the contraband would be stored in cabbage boxes that would be provided by the CI. The CI would further this subterfuge by preparing a fraudulent bill of lading for cabbage. Chuy declared that a letter would be placed on the "boxes of cabbage" to indicate their destination (PSR ¶ 12).

On February 28, 2003, Hernandez and the CI reconnoitered in the vicinity of the San Juan Del Valle Shrine in San Juan, Texas. Hernandez was there to retrieve 100 cabbage boxes which were going to be used to conceal marijuana. The CI, the undercover agent, and Hernandez placed the cabbage boxes in Hernandez's conveyance. Hernandez was followed from the site to McAllen, Texas, where he met with two, unidentified Hispanic men. Hernandez took the boxes from his vehicle and placed them in a Jeep Cherokee. The Jeep Cherokee was kept under surveillance as it was driven to a meeting with two other unidentified individuals. Unfortunately, after observing this rendezvous, the agents lost it (PSR ¶ 13).

On March 1, 2003, Hernandez met the CI in the parking lot of the Alamo Bank in Harlingen,

4

Texas. Hernandez asked the CI for an envelope that contained a description and the license plate of the tractor-trailer that was going to be used to commit the offense. Hernandez inspected the exterior of the tractor trailer while simultaneously carrying on a conversation on his cellular telephone. Hernandez told the CI that "Chuy" wanted him to take a few pictures of the exterior of the tractor trailer. To that end, Hernandez went over to a Conoco gasoline station and purchased a disposable camera. Hernandez snapped a few pictures of the tractor trailer and told the CI that the load would soon be ready. The CI told Hernandez to call him when he was on the way with the marijuana so he could give him directions to the loading site. As Hernandez left the area, he was followed by surveillance agents to 6516 Bandera Street, Edinburg, Texas. Interestingly, Hernandez seemed to have driven to the Bandera Street premises in tandem with a black Jeep Cherokee which also stopped at the Bandera Street location. Six vehicles were observed in the vicinity of the residence. A little later, the agents observed the arrival of a gold Buick sedan and a red GMC Safari. The Safari was registered to Doris Boracio, Garcia-Jasso's girlfriend (PSR ¶ 14).

At 8:14 p.m., surveillance watched as Jesus Tapia and Jose Manuel Guerrero and the undercover officer loaded boxes from the Safari into the tractor-trailer (PSR ¶ 16). While the boxes were being transferred, Hernandez conversed with the CI and made a cellular telephone call. After Hernandez had completed the call, the arrest signal was given. Tapia, meanwhile had jumped from the tractor-trailer so it could be moved and Guerrero closed the doors to the Safari. After the vehicles were moved, Tapia got back onto the tractor trailer, saw the warning lights of the police cruisers, and promptly jumped off of it again. Tapia made for a chain linked fence which he attempted to jump only to have his trousers entangled in the barbed wire thwarting his escape. Hernandez and Guerrero were arrested without incident (PSR ¶ 17).

After the arrest, the agents who remained at 6516 Bandera Street secured a consent to search the premises from the owner, Maria Ermelinda Vasquez, Garcia-Jasso's wife. Ms. Vasquez told the agents that Jesus Tapia had been occupying the front bedroom of the house for about three weeks rent-free. Meanwhile, the agents discovered some ten bundles of marijuana weighing approximately 57.82 kilograms hidden in a closet. Marijuana cigarettes were found in the top drawer of a night stand. A Voicestream cellular telephone was also found and seized (PSR ¶¶ 18, 19).

Guerrero told the agents that he had come to Edinburg for a barbecue and to help his friend Jesus Tapia wrap marijuana. After wrapping the marijuana, Guerrero related that he placed it in cabbage boxes. According to Guerrero, Hernandez instructed Tapia and himself on how to package the contraband. After about 45 minutes, the marijuana was loaded into a red van that Hernandez had backed into the garage. Guerrero and Tapia then followed Hernandez over some back roads to a Motel 6 located in Harlingen, Texas. From the Motel 6, they drove to a warehouse where they were arrested while loading the tractor trailer (PSR ¶ 22).

## IV

## RESPONSE AND AUTHORITIES

A. **Ground one - failure to perfect an appeal**

The rubric for assessing the constitutional efficacy of counsel is well established: To secure relief under a complaint for ineffective assistance of counsel, a § 2255 petitioner must show (1) counsel's performance was deficient and (2) prejudice. A criminal defendant alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 842 (1993)(quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984)). In *Fretwell*, the Court

observed:

> [An] analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

506 U.S. at 369-70, 113 S.Ct. at 842-43. The "prejudice" prong of the *Strickland* test focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Id.* 506 U.S. at 372, 113 S.Ct. at 844. *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1997).

The burden falls on the accused to prove a violation of constitutional standards. The focus is on the attorney's impact on the adversarial process; the constitutional standards may be met irrespective of an accused's evaluation. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039 (1984). The Fifth Circuit has noted that:

> "prejudice" must be rather appreciable before a new trial is warranted in view of counsel's error. *See, e.g., Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838 (1993)...

*Spriggs v. Collins*, 993 F.2d 85, 88-89 n.4 (5th Cir. 1993); *Armstead v. Scott*, 37 F.3d 202, 207 (5th Cir. 1994).

In *Roe v. Flores-Ortega*, 528 U.S. 470, 120 S.Ct. 1029 (2000), the Supreme Court held that counsel has a constitutional duty to consult with his client about an appeal. The Supreme Court rejected the *per se* rule used by some circuits that a lawyer is always obligated to file a notice of appeal or discuss the possibility of an appeal with the defendant. *Roe*, 120 S. Ct. at 1035. The Court

first held that the well-known *Strickland* test would apply to counsel's failure to file a notice of appeal. For the "deficient performance prong" it created the new test of **"whether counsel in fact *consulted* with the defendant about an appeal."** *Id.* [emphasis added]. The Court even defined what it meant by "consulting": "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." *Id.* Then after consulting, if counsel fails to file a notice of appeal over the defendant's express instructions, it would be professionally unreasonable. *Id.* The Court ruled that, constitutionally, a lawyer has **no *per se* duty to consult in every case.** *Id.* at 1036. For instance, according to Justice O'Connor, consultation would not be required: (1) when the defendant pleaded guilty, the court informs the defendant of his appellate rights, the defendant never expresses any wishes or interest in an appeal, and counsel does not see any nonfrivolous claims to raise; or (2) when the court fully, clearly, and informatively tells the defendant of his appellate rights, counsel may not feel the need to repeat the information. *See id.*

The *Roe* Court held that a lawyer has a constitutional duty to consult when (1) a rational defendant would want to appeal (i.e. when there are nonfrivolous claims), or (2) when the defendant reasonably demonstrates an interest in appeal. *Id.* In *Roe* the defendant had 60 days to file a notice of appeal, but for the first 90 days after judgment he was unable to communicate with his lawyer. He claimed that his lawyer promised she would file a notice of appeal, but never did. Then the defendant filed an untimely pro se notice of appeal, which was rejected. The Court found that the defendant did not know the process and that he and his lawyer had a conversation in jail just after judgment in which he could have reasonably believed his lawyer would file "appeal papers." *Id.* at 1033.

8

In this case, Hernandez assails his attorney's alleged failure to perfect an appeal after he reportedly instructed him to do so. If counsel failed to perfect an appeal in the face of an express request for an appeal, counsel was reasonable in failing to do so - in his plea agreement(Dkt 36), Hernandez expressly waived his right of appeal. Moreover, prior to closing the sentencing proceeding, the district court reviewed that waiver with Hernandez (Dkt 90, pp. 6-7). This knowing waiver of appeal is enforceable and effectively deprived the court of appeals of jurisdiction over the case on the issues Hernandez deemed appealable. *United States v. White*, 307 F.3d 336, 343-44 (5th Cir. 2002) (Holding that an ineffective assistance of counsel argument would survive a waiver of appeal only when the claimed assistance directly affected that waiver or the plea itself. The court declared, "We ask, whether the plea or waiver itself was knowing or voluntary, and whether the issue challenged on appeal may properly be the subject of the waiver. If the answer to both questions is yes, then the guilty plea sustains the conviction and sentence and the waiver can be enforced."). *See also, United States v. Baymon*, 312 F.3d 725, 727 (5th Cir. 2002)("The right to appeal a conviction and sentence is a statutory right, not a constitutional one, and a defendant may waive it as part of a plea agreement."). The issues Hernandez proposes to raise on direct appeal (adjustment of offense level for leadership role in the offense and failure to adjust the offense level for his compliance with the requirements of § 5C1.2) are demonstrably frivolous and fall squarely within the terms of the waiver. Relief on this ground can be denied on the record: if counsel had perfected an appeal, it would have been an exercise in futility - Hernandez had waived the right when he pled guilty.

B.  **Failure to investigate**

Hernandez complains that his attorney failed to prepare for trial by performing any independent investigation or by interviewing any witnesses. In *Bryant v. Scott*, 28 F.3d 1411 (5th

9

Cir. 1994), the court observes:

> However, an attorney must engage in a reasonable amount of pretrial investigation and "at a minimum, ... interview potential witnesses and ... make an independent investigation of the facts and circumstances in the case. *Nealy v. Cabana*, 764 F.2d [1173], at 1177. The failure to interview eyewitnesses to a crime may strongly support a claim of ineffective assistance of counsel, *see Gray v. Lucas*, 677 F.2d 1086, 1093 n.5 (5th Cir. 1982)(noting that attorney's failure to investigate crucial witness may constitute inadequate performance), *cert. denied*, 461 U.S. 910, 103 S.Ct. 1886 (1983), and when alibi witnesses are involved it is unreasonable for counsel not to try to contact the witnesses and "ascertain whether their testimony would aid the defense." *Grooms v. Solem*, 923 F.2d 88, 90 (8th Cir. 1991), *cert. denied*, 461 U.S. 910, 103 S.Ct. 1886 (sic).

28 F.3d at 1415. In *Bryant*, counsel was alerted to at least three potential alibi witnesses that he should have made some effort to contact or interview; counsel's complete failure to investigate these alibi witnesses was held to have fallen below the standard of a reasonably competent attorney practicing under prevailing professional norms. 28 F.3d at 1418. Moreover, Bryant's counsel also failed to interview two eyewitnesses to the offense as well as Bryant's co-defendant who confessed to the offense and declared that Bryant was not the other perpetrator. 28 F.3d at 1419.

In *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527 (2003), the Supreme Court revisited its definition of the deference "owed strategic judgments in terms of the adequacy of the investigations supporting those judgments":

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed in all the circumstances, applying a heavy measure of deference to counsel's judgments.

539 U.S. at 521-522, 123 S.Ct. at 2535 (quoting *Strickland v. Washington*, 466 U.S. 668, 690-691).

10

In *United States v. Drones*, 218 F.3d 496 (5th Cir. 2000), the Fifth Circuit notes that "in failure to investigate cases the temptation to rely on hindsight is strong" and noted the provisions of *Strickland* quoted in *Wiggins, supra.* 218 F.3d at 500. In reversing the district court's award of § 2255 relief in *Drones*, the court notes that the decision not to pursue evidence that could be "double-edged in nature [was] not objectively unreasonable and therefore does not amount to deficient performance." 210 F.3d at 501 (quoting *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999)).

Here, Hernandez would have his attorney review the "CI"'s file, interview co-defendants, and review telephone records. Initially, it is doubtful that Hernandez's attorney would have been afforded access to the CI's entire file. Moreover, investigation into the CI and the co-conspirators' would more likely led to the discovery of incriminating evidence. This is precisely the "double-edged" type of evidence that it is not objectively unreasonable not to pursue. Here, the co-conspirators stood to gain by cooperating with the government and testifying against Hernandez. It is beyond cavil that the CI initiated contact with Hernandez after learning of his interest in recruiting marijuana transporters. Information that may have been gleaned from these individuals would not have undermined confidence in the outcome of the proceeding - it would have buttressed it. Hernandez cannot show that his attorney abrogated his right to the effective assistance of counsel by not conducting a thorough investigation into the activities of the CI and his co-conspirators.

C.   **Whether to plead guilty - the effectiveness of counsel**

In *Armstead v. Scott*, 37 F.3d 202 (5th Cir. 1994), the Fifth Circuit reviewed the requirements for a successful ineffective assistance of counsel claim. The court observed that in a guilty plea scenario, the petitioner must prove not only that his attorney actually erred, but also that he would not have pled guilty but for that error. 37 F.3d at 206 (citing *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct.

11

366 (1985)). The defendant must affirmatively prove prejudice; a mere allegation of prejudice is not sufficient. The petitioner must establish that but for his counsel's erroneous advice, he would not have pleaded guilty but would have insisted on going to trial. *Armstead*, 37 F.3d at 206 (citing *Carter v. Collins*, 918 F.2d 1198, 1200 (5th Cir. 1990)); *see also, United States v. Payne*, 99 F.3d 1273, 1282 (5th Cir. 1996). This assessment, in turn, will depend in part on a prediction of what the outcome of the trial might have been. *Id.* (citing *Hill v. Lockhart*, 474 U.S. at 56-58, 106 S.Ct. at 369-370).

Hernandez asserts that his counsel's cumulative failings undermine the reliability of his guilty plea. This assertion is undermined by the facts. Hernandez's guilt rests only in part on the evidence that might be proffered by a CI. The criminal conduct in controversy was observed by government agents - Hernandez was caught literally "red handed". The cumulative testimony of the investigating agents plus any evidence that might be proffered from co-conspirators renders the prospects of acquittal in this case remote at best. Counsel did not abrogate Hernandez's right to the effective assistance of counsel when he advised him to plead guilty.

D.  **Need for an evidentiary hearing**

A Section 2255 Motion requires a hearing unless the files, the motion, and the record of the case conclusively show that no relief is appropriate. 28 U.S.C. § 2255 (foll.), Rule 8(a). *United States v. Santora*, 711 F.2d 41 (5th Cir. 1983). The need for an evidentiary hearing depends upon an assessment of the record. If the district court cannot resolve the allegations without examining evidence beyond the record, it must hold a hearing. If the record is adequate to fairly dispose of the allegations, the court need inquire no further. *United States v. Smith*, 915 F.2d 959, 964 (5th Cir. 1990).

Although the allegations of a *pro se* complaint are held to a less stringent standard than the formal pleading drafted by lawyers, if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief, the cause will be dismissed. *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594 (1972). The instant cause does not merit a hearing.

The government prays that this court enter an order dismissing Hernandez's motion for failure to state a claim upon which relief can be based.

                Respectfully submitted,

                MICHAEL T. SHELBY
                United States Attorney

By: _____
                JAMES L. TURNER
                Assistant United States Attorney
                Attorney for respondent
                P.O. Box 61129
                Houston, Texas 77208
                State bar No. 20316950
                Fed.Id.No. 1406
                (713) 567-9102

## CERTIFICATE OF SERVICE

I, James L. Turner, do hereby certify that a copy of the foregoing Response to Section 2255 Motion, Motion To Dismiss for Failure to State a Claim has been mailed on this the 21 day of October, 2004, via certified mail, return receipt requested to

Mr. Luis Antonio Hernandez
Reg No. 82033-079
Federal Correctional Institution
Forrest City
P.O. Box 9000
Forrest City, AR 72336-9000

_____
JAMES L. TURNER
Assistant United States Attorney